IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMANUAL SCHMALZ, individually, and on behalf of all others similarly situated | : : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | No. 08-CV-0857 |
| | : | (consolidated No. 08-CV-1991) |
| SOVEREIGN BANCORP, INC., et al. | : | |

**MEMORANDUM**

Ditter, J.                                                                                    April 17, 2012

        This class action involves an employee stock ownership plan and the contention that its

participants should not have been offered their employer's stock because of the company's

deteriorating financial condition.  It is before me on the defendants' motion to dismiss.  For the

reasons that follow, I will dismiss all but Count IV of plaintiffs' complaint.

**I.  INTRODUCTION**

        The plaintiffs were participants in defendant Sovereign Bancorp, Inc.'s ("Sovereign")

employee retirement savings plan.  The Plan held Sovereign stock as an investment.  The

plaintiffs have brought this class action under ERISA §§ 502(a)(2) and (a)(3) on behalf of the

Plan and similarly situated participants of the Plan.  They allege the defendants breached various

fiduciary duties in administering and managing the Plan and its assets during the class period of

January 1, 2002 through the present.

        The participants were able to choose how their contributions were invested among

numerous options, one of which was an employee stock ownership plan ("ESOP"), which

invested "primarily in Sovereign stock."  The plaintiffs suffered substantial losses which they say

are due to the defendants' decision to permit the Plan to hold and acquire Sovereign stock, which lost over 90% of its value in the class period.

More specifically, the plaintiffs claim that defendants breached their fiduciary duty to prudently manage the Plan by continuing to offer Sovereign stock (Count I), failing to provide participants with complete and accurate information (Count II), failing to monitor, remove or replace the Plan fiduciaries (Count III), breaching their fiduciary duty of loyalty by charging an unreasonable rate of interest in connection with the Plan's purchase of Sovereign stock (Count IV), breaching their fiduciary duty of loyalty by furthering their personal interests at the expense of the Plan (Count V), and breaching their duty as co-fiduciaries (Count VI).

The defendants have moved to dismiss the amended complaint arguing that: (1) the plan required investment in company stock and therefore bars a claim for a breach of fiduciary duty; (2) the defendants are entitled to a presumption of prudence for their decision to continue to offer the company stock that plaintiffs cannot overcome; (3) plaintiffs fail to allege a disclosure claim; (4) the interest payments were not prohibited; (5) the fiduciaries did not knowingly act contrary to the best interests of the participants and beneficiaries, and (6) because there is no underlying breach of fiduciary duty, the derivative claims of a breach of co-fiduciary duties and the duty to monitor fail.

## II.  FACTS[1]

### A.  The parties

The lead plaintiffs in this case, Emmanuel Schmalz and Gail Wentworth, are former

---

[1] All facts, unless otherwise noted, are taken from the amended complaint and the documents relied upon in that complaint, as well as the undisputedly authentic documents attached to the defendants' motion to dismiss.

employees of Sovereign who were participants in the Sovereign Plan[2] and held company stock in their retirement investment portfolios during the class period.

The defendants fall into three classes: the Sovereign Defendants, the Director Defendants, and the Committee Defendants.  The Sovereign Defendants include Sovereign Bancorp, Inc., and Fay A. Knabb.  Sovereign was the Plan Sponsor and allegedly exercised authority over the management and administration of the Plan and its assets.  Knabb was an employee of Sovereign and is alleged to have served as "the Plan Administrator."  She and each of the individual Director Defendants[3] are alleged to have "exercised discretionary authority with respect to the management and administration of the Plan and/or [had] authority or control over the management and disposition of the Plan's assets."  Am. Compl. ¶¶ 16-30.

The Committee Defendants include two committees: the Compensation Committee and the Retirement Savings Plan Committee ("Retirement Committee").  The Compensation Committee is alleged to have administered the "equity compensation programs, including the Plan" through its members: Director Defendants Ehlerman, Fry, Hard, Heard, Heras, Hove, Moran, Ramirez, Rodriguez and Whitworth.  The Retirement Committee was charged with administering and monitoring the Plan, approving the Plan's investment policies and guidelines, reviewing the performance of investments, and appointing and retaining trustees for the Plan.  It acted through its members: Director Defendants Ehlerman, Fry, Hard, Heard, Heras, Ramirez,

---

[2] The Plan is attached as Exhibit 2 to the defendants' motion to dismiss.

[3] The Director Defendants are Joseph P. Campanelli, P. Michael Ehlerman, John Fry, Brian Hard, Marian Heard, Gonzalo de Las Heras, Andrew C. Hove, Jr., William J. Moran, Maria Fiorini Ramirez, Juan Rodriguez-Inciarte, Daniel K. Rothermel, Jay S. Sidhu, Cameron C. Troilo, Sr., and Ralph V. Whitworth.

Rodriguez, Rothermel, Sidhu, and Troilo.

**B. The Structure And Terms Of The Plan**

The Plan is a defined contribution plan that covers eligible employees of Sovereign and its subsidiaries. It is actually a combination of two plans, a 401(k) Retirement Savings Plan adopted in 1987, and an Employee Stock Ownership Plan ("ESOP") adopted in 1990. The ESOP is a plan "designed to invest primarily in common stock of [Sovereign]." It was merged with the 401(k) plan, effective November 1, 2004, to form the Sovereign Bancorp, Inc. Retirement Plan at issue here ("the Plan"). The Plan was adopted and maintained "for the benefit of [Sovereign's] employees" to help participants build income for retirement.

**1. Administration of the Plan**

The Plan explicitly defines the "Duties and Responsibilities of Fiduciaries," assigning Sovereign, by way of its Board of Directors, "sole responsibility for making the contributions provided for under this Plan, and shall have the sole authority to appoint and remove the Trustee,[4] and to amend or terminate, in whole or in part, this Plan or the Trust." Plan § 10.1. In addition, Sovereign had "discretionary, final authority to construe and interpret the Plan documents . . . Any construction, interpretation, or application of the Plan by the Company shall be final, conclusive and binding." Plan §§ 10.14, 12.1, 14.1.

In addition, Sovereign had "the sole responsibility for the administration of this Plan," but was permitted to "appoint an Administrative Committee to discharge its duties as Plan administrator." Plan § 10.1. Sovereign did appoint such a committee: the Retirement

---

[4] The Trustee of the Plan is the Charles Schwab Trust Company.

Committee.[5]

All of the contributions under the Plan were to be paid to the Trustee to be deposited into the Trust Fund and retained for the exclusive benefit of the participants and beneficiaries. The Retirement Committee was granted the power to direct the Trustee's purchase of Company Stock. In addition, if a Participant chose not to direct the balances in his or her Accounts, the amounts were "invested in an investment vehicle selected by the [Retirement Committee]." Plan § 8.2.

### 2. Investing Under the Plan

The Plan allows participants to build income in their Plan accounts from two sources: 1) pre-tax deferrals (the amount participants contribute to the Plan on a pre-tax basis); and 2) matching contributions that may be made by Sovereign.

### a. Pre-Tax Deferral Investments Options

Participants had "the right to elect from among one or more separate and distinct investment vehicles designated by the Company and made available from time to time including the Company's common stock." Plan § 8.2. The Plan offered Participants fifteen investment options, including Sovereign Common Stock.

Plan Participants were expressly notified of the risk of investing in the Sovereign Stock Fund. In the Plan's "Risk of Investment" section, it cautioned: "Each Participant and Beneficiary shall assume all risk connected with the fluctuation in value of the balances in his Account."

---

[5] Plaintiffs also allege that defendant Knabb was an employee of Sovereign and served as Plan Administrator. Am. Compl. ¶ 16.

Plan § 11.5.  The Summary Plan Description[6] ("SPD"), provided to all participants, further

warned participants: "[T]he Sovereign Stock Fund is different from the Plan's other investment

funds.  It invests only in one security – Sovereign common stock – instead of a diversified

portfolio of investment like the other funds.  If you hold investments in the Sovereign Stock

Fund, you should be aware that there is a risk to holding substantial portions of your assets in the

securities of any one company, as individual securities tend to have wider price swings, up and

down, in shorter periods of time than investments in diversified investment funds."  SPD at 16.

The Plan also stated that "[t]o the extent a Participant exercises control over the assets in

his Accounts," there can be no breach of fiduciary duty for any loss that "results from such

Participant's exercise of control and investment direction."  Plan § 8.3.

Sovereign stock represented a major portion of the total invested assets of the Plan

throughout the Class Period.

### b. Matching Contributions

Sovereign made a matching contribution of 100% of the first 3% of eligible

compensation contributed to the Plan, plus 50% of the next 2% of a participant's contributed

compensation.  Plan § 3.1(c).  The Plan states that Sovereign "may contribute cash or shares of

Company Stock, or both, in such amounts as may be determined by the Board of Directors."

Plan § 3.1(e).  The SPD explains that "[c]ontributions to your Sovereign ESOP Contribution

Account are primarily invested in shares of Sovereign common stock," and that the contributions

"are invested in the Sovereign Stock Fund when they are initially contributed to the Plan.

SPD at 18.  After match contributions are deposited into your Account, *you may elect to transfer*

_____

[6] The SPD is attached as Exhibit 1 to the defendants' motion to dismiss.

*the contributions into the Plan's other investment funds*, subject to certain limitations . . ."

SPD at 15 (emphasis added).[7]

The SPD states that "Sovereign *currently contributes* the matching contribution in the

form of Sovereign common stock."  SPD at 11.  The Board of Directors amended the Plan on

June 19, 2002, to state that "[t]he matching contribution *will be* made in the form of Employer

common stock."  Res. Of Bd. Of Dir. (June 19, 2002) at ¶ 9 (emphasis added).

### C.  Company Activity in the Class Period

In May 2006, Sovereign began expanding its auto-loan business from the Northeast into

the Southeast and Southwest.  In addition to this expansion, Sovereign acquired Independence

Community Bank Corp. ("Independence") in June 2006.  Through Independence, Sovereign

created its Metro New York segment in an attempt to expand its operations to the New York City

metropolitan area.

By the end of 2007, Sovereign wrote off $76.2 million in charges for auto loans.

Sovereign reported that it lost $1.6 billion, or $3.34 per share, in the fiscal fourth quarter of 2007,

and $1.3 billion, or $2.85 per share, in the full 2007 fiscal year.  Am. Compl. at ¶ 143.  In

January 2008, Sovereign announced it would end its auto-loan operations in nine states.  The

following month, Sovereign  announced that the goodwill impairment charge (the write off of

intangible assets) for its Metro New York segment was $943 million.  *Id.* at ¶ 93

---

[7] Sovereign's SEC filing further explained that "Participants may direct their contributions to various investment options consisting of Sovereign Bancorp, Inc. common stock, a common collective trust, money market funds and selected registered investment companies . . ..  Sponsor matching contributions are invested in Sovereign Bancorp, Inc. common stock when they are initially credited to the participant's accounts.  Participants are then able to immediately direct Sponsor matching contributions to any of the Plan's investment options."  Sovereign Form 11-K (June 28, 2007).

Over the same time period the value of Sovereign's stock declined.  "The price of
Sovereign stock fell from $26.42 on February 20, 2007 to $2.33 on September 29, 2008 (a 91.2%
drop) . . .."  Opp. to MTD at 5-6.  In addition to this decline in stock value, on April 23, 2008,
Moody's Investors Service lowered Sovereign's credit rating two levels from an A3 to a Baa2.

On October 13, 2008, Sovereign's Board of Directors approved the sale of the company
to Banco Santander Central Hispano.  That same day, Sovereign filed an SEC report noting a net
loss of $982 million.

## III.  DISCUSSION

### A.  Pleading Standards

The initial complaint was filed on February 21, 2008, and the amended complaint was
filed on July 23, 2008.  At the time of both filings, the Third Circuit had ruled that the pleading
standards set forth in *Twombly* were not limited to the anti-trust context.  The plaintiffs are
therefore required to meet the *Twombly* standard, which  "'does not impose a probability
requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable
expectation that discovery will reveal evidence of' the necessary element."  *Phillips v. County of
Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (*quoting Bell Atl. Corp. v. Twombly,* 127 S. Ct.
1955, 1965 (U.S. 2007)).

Generally, claims for breach of fiduciary duty under ERISA are governed by Federal Rule
of Civil Procedure 8(a).  I must accept as true all of plaintiffs allegations, but I am not required to
credit conclusory statements of law.  To survive a motion to dismiss, the plaintiffs cannot rest on
a "formulaic recitation of the elements" or mere "labels and conclusions," but must set forth a
plausible claim for relief.  *Twombly*, 127 S. Ct. at 1964-65.

8

To the extent that the complaint sets forth claims that sound in fraud, such as plaintiffs'

allegations of false and material misstatements, they are subject to the heightened pleading

requirement of Federal Rule of Civil Procedure 9(b).  *See, e.g., Johnson v. Radian Group, Inc.*,

No. 08-2007, 2009 U.S. Dist. LEXIS 61334, *33 (E.D. Pa. July 16, 2009) (holding same and

citing cases).

**B.  Failure to Prudently and Loyally Manage the Plan (Count I)**

The plaintiffs allege that the defendants failed to prudently and loyally manage the Plan

assets.[8]  Specifically, they assert that the defendants should not have continued to offer and invest

in Sovereign stock when it was no longer a suitable investment.

In *Johnson*, the Honorable Mary A. McLaughlin summarized the applicable standard of

prudence under ERISA:

> ERISA § 404 establishes a "prudent man" standard of care to govern the actions
> of plan fiduciaries.  29 U.S.C. § 1104(a).  Plan fiduciaries must discharge their
> duties "with the care, skill, prudence, and diligence under the circumstances then
> prevailing that a prudent man acting in a like capacity and familiar with such
> matters would use in the conduct of an enterprise of a like character and with like
> aims."  *Id.* § 1104(a)(1)(B).  The duty of prudence requires a plan fiduciary to
> diversify the investments of the plan so as to minimize the risk of large losses,
> "unless under the circumstances it is clearly prudent not to do so."  *Id.*
> § 1104(a)(1)(C).  Fiduciaries must also act "in accordance with the documents and
> instruments governing the plan" insofar as those documents and instruments are
> consistent with ERISA.  *Id.* § 1104(a)(1)(D).
>
> A court's task in evaluating a fiduciary's compliance with the duty of prudence is
> to inquire whether a fiduciary employed the appropriate methods to investigate
> and determine the merits of a particular investment.  The prudence requirement is
> thus an objective standard, focusing on a fiduciary's conduct in arriving at an
> investment decision, and not on the results of that decision.  *In re Unisys Sav.
> Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *see also Kirschbaum v. Reliant*

---

[8] As set forth above, the plaintiffs have classified the defendants into three groups but the
allegations throughout the complaint refer generally to "defendants."

*Energy, Inc.*, 526 F.3d 243, 253 (5th Cir. 2008) (stating that the focus of the prudence inquiry is "how the fiduciary acted," and not "whether his investments succeeded or failed.") (*quoting Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983)).

The prudence requirement is also a flexible standard, and a fiduciary's conduct is to be evaluated in light of the character and aims of the particular type of plan he serves. *In re Unisys*, 74 F.3d at 434 (*quoting Donovan*, 716 F.2d at 1467); *see also Varity Corp. v. Howe*, 516 U.S. 489, 497, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996) (stating that courts must interpret the prudence requirement in a manner consistent with "the special nature and purpose of employee benefit plans").

2009 U.S. Dist. LEXIS 61334, at *35-37.

### 1. Three Standards of Review Based on Whether the Plan Requires, Permits, or More than Permits an Offer of Stock

The Third Circuit applies three different standards of review to a fiduciary's decision to offer a particular stock in an ESOP depending on whether the Plan: (1) "requires;" (2) "merely permits;" or (3) "more than simply permit[s]" the fiduciary to make such decisions. *Edgar v. Avaya, Inc.*, 503 F.3d 340 (3d Cir. 2007); *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995).

In the first circumstance, where a "trust requires the trustee to invest in a particular stock, then the trustee is immune from judicial inquiry." *Edgar*, 503 F.3d at 346. *See e.g., In re Citigroup ERISA Litig.*, No. 07-9790, 2009 U.S. Dist. LEXIS 78055, *23 (S.D.N.Y. Aug. 31, 2009) (finding defendants had no fiduciary duty where they had no discretion to eliminate the company stock fund because the plan stated company stock "shall be permanently maintained").

In the second circumstance, "if the trust merely permits the trustee to invest in a particular stock, then the trustee's investment decision is subject to de novo judicial review." *Edgar*, 503 F.3d at 346 (internal citations omitted). *See, e.g., In re Schering-Plough Corp. ERISA Litig.,* 420 F.3d 231, 236 (3d Cir. 2005) (applying de novo review to a plan where

investment options "*may include* such equity funds, international equity funds, fixed income funds, money market funds, a Company Stock Fund, and other funds investment vehicles as the Investment Committee elects to offer").

In the third circumstance, where a fiduciary is "not absolutely required to invest in employer securities but is more than simply permitted to make such investments . . . the fiduciary's decision to continue investing in employer securities should be reviewed for an abuse of discretion." *Moench*, 62 F.3d at 571; *Edgar*, 503 F.3d at 347 (applying the *Moench* abuse of discretion standard to EIAPs[9]). *See, e.g., Dann v. Lincoln Nat'l Corp*., 708 F. Supp. 2d 481, 489-490 (E.D. Pa. 2010) (applying abuse of discretion standard where the plans read as a whole "contemplate and expect that the [company] Stock Fund is available as an investment option").

### 2. Assessing the Plan's Discretion

In order to apply the proper standard, it is necessary to determine the level of discretion permitted by the Plan.  The Plan states: "Each Participant shall have the right to elect from among one or more separate and distinct investment vehicles designated by the Company and made available from time to time including the Company's common stock."  Plan § 8.2.

The defendants interpret the phrase "made available from time to time" to modify only the preceding clause and argue that Sovereign common stock *must* be offered, while all other

---

[9] EIAP stands for "Eligible Individual Account Plan."  An EIAP is defined as "an individual account plan which is (i) a profit-sharing, stock bonus, thrift, or savings plan; (ii) an employee stock ownership plan; or (iii) a money purchase plan which . . . [is] invested primarily in qualifying employer securities."  29 U.S.C. § 1107(d)(3)(A).  "Because one of the purposes of EIAPs is to promote investment in employer securities, they are subject to many of the same exceptions that apply to ESOPs."  *Edgar*, 503 F.3d at 347.

stock options will be available from time to time.  In essence, they read this portion of the Plan as: "Each Participant shall have the right to elect from among one or more separate and distinct investment vehicles designated by the Company[,] and made available from time to time[,] including the Company's common stock."

The plaintiffs, on the other hand, read this provision as allowing Sovereign to offer company stock, just like any other stock, "from time to time."  They read this clause as: "Each Participant shall have the right to elect from among one or more separate and distinct investment vehicles designated by the Company and made available from time to time[,] including the Company's common stock."

The Plan's plain language is inclusive and favors the plaintiffs' reading.  Regardless, because both parties present reasonable readings of the same language, the Plan is ambiguous on whether company stock *must* be offered all the time or only "from time to time."  At the motion to dismiss stage, I must interpret the language in the light most favorable to the plaintiffs as the non-moving party.[10]  Thus, I do not find that Count I must be dismissed because the Plan required the company stock to be offered and therefore is not subject to judicial review.

However, no matter how the Plan is read, it does more than "merely permit" the offering of company stock.  The Plan sets out in its introduction that the ESOP is "designed to invest primarily in common stock of the Employer."   Plan at p.1.  "Company Stock" is a defined term and is the only named investment vehicle in the Plan.  Matching contributions were made in the

---

[10] The Plan permitted Sovereign to interpret the Plan terms.  However, the defendants do not argue that Sovereign ever exercised this power or point to any documents attached to the Amended Complaint or relied upon by the plaintiffs demonstrating Sovereign interpreted the Plan to *require* investment in Sovereign common stock.

form of Sovereign common stock as set forth in the Plan, the SPD, and other documents.  *See, e.g.,* Res. of Bd. of Dir. (June 19, 2002) at ¶ 9 ("The matching contribution will be made in the form of Employer common stock.").  These references to investment in the company stock are sufficient to trigger the presumption of prudence.  *See, e.g., Dann*, 708 F. Supp. 2d at 489 (applying *Moench* presumption where the Plan granted fiduciaries discretion to terminate *any* of the funds, but where each participant's account was to include an ESOP subaccount and where employer contributions would be initially invested in company stock or made in cash); *In re Schering-Plough ERISA Lit.*, No. 08-1432, 2010 U.S. Dist. LEXIS 64381, *5, 12 (E.D. Pa. June 29, 2010) (applying *Moench* presumption where the Plan permitted participants to "choose from a wide range of mutual funds and other investments funds, and as a matter of Plan design, participants also [could] choose to invest in [company] common stock"); *Herrera v. Wyeth*, No.08-4688, 2010 U.S. Dist. LEXIS 27611, *17 (S.D.N.Y. Mar. 17. 2010) (applying presumption of prudence where the company stock fund was referenced throughout the plan and where the plaintiff did not reconcile a "plausible way of harmonizing the repeated references to the Stock Fund, on one hand, with a theory, on the other, that Defendants had discretion not to offer the fund at all").

I will therefore apply an abuse of discretion standard and, pursuant to *Moench* and *Edgar*, I will presume the fiduciaries acted consistently with ERISA. *Moench*, 62 F.3d at 571; *Edgar*, 503 F.3d at 347.

### 3. *Moench* Presumption of Prudence

The presumption of prudence has been referred to as "a substantial shield." *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008).  To rebut the *Moench* presumption of

prudence, the plaintiffs "must show that the ERISA fiduciary could not have believed reasonably that continued adherence to the ESOP's direction was in keeping with the settlor's expectations of how a prudent trustee would operate." 62 F.3d at 571. "[S]hort-term financial difficulties do not create a duty to halt or modify investments in an otherwise lawful ERISA fund that consists primarily of employer securities. . . . Plan fiduciaries *do not* have a duty to depart from ESOP or EIAP plan provisions whenever they are aware of circumstances that may impair the value of company stock." *Johnson*, 2009 U.S. Dist. LEXIS 61334, at *41-42 (emphasis added). Instead, "there should be 'persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest.'" *Id.* at *42.

Indeed, the Third Circuit cautioned that courts must be aware that if a fiduciary "does not maintain the investment in the employee's securities, it may face liability . . . particularly if the employer's securities thrive." *Moench*, 62 F.3d at 572. The Fifth Circuit, citing this cautionary language, explained:

> One cannot say that whenever plan fiduciaries are aware of circumstances that may impair the value of company stock, they have a fiduciary duty to depart from ESOP or EIAP plan provisions. Instead, there ought to be persuasive and analytically rigorous facts demonstrating that reasonable fiduciaries would have considered themselves bound to divest. Less than rigorous application of the *Moench* presumption threatens its essential purpose. A fiduciary cannot be placed in the untenable position of having to predict the future of the company stock's performance. In such a case, he could be sued for not selling if he adhered to the plan, but also sued for deviating from the plan if the stock rebounded.

*Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 256 (5th Cir. 2008).

Plaintiffs therefore must allege facts depicting the "dire situation" that would require fiduciaries to cease investment in company stock. "Such facts might include, as was the case in

*Moench*, a 'precipitous decline' in the price of the employer's stock, together with allegations that plan fiduciaries knew of the stock's 'impending collapse' and the fiduciaries' own internal conflicts over the proper course of action for the ESOP." *Johnson*, 2009 U.S. Dist. LEXIS 61334, at *41.

In *Edgar*, the Third Circuit found that "corporate developments that were likely to have a negative effect on the company's earnings, and therefore, on the value of the company's stock" and a "corresponding drop in stock price" failed to "create[] the type of dire situation which would require defendants to disobey the terms of the Plans by not offering the [company stock fund] as an investment option, or by divesting the Plans of [company] securities." *Edgar*, 503 F.3d at 348. *Edgar* was aptly summarized as follows:  "[T]he allegations of the complaint regarding a troubled and financially disappointing corporate acquisition by Avaya, drastic downturns in sales of company products and demand therefor, and a corresponding drop in stock price did not rebut the presumption of prudence to which the Avaya plans' fiduciaries were entitled." *Graden v. Conexant Sys., Inc.*, 574 F. Supp. 2d 456, 463 (D.N.J. 2008).  It is not necessary that a company be on "the brink of bankruptcy," but "bare allegations of fraud and other wrongdoing" are insufficient. *Edgar*, 503 F.3d at 349.

The defendants assert that the plaintiffs have not pleaded the requisite "dire situation" necessary to overcome this presumption of prudence.  They argue that a drop in stock price, standing alone, is insufficient especially where the drop in Sovereign's stock value followed the market as a whole.  Finally, they note that Sovereign has not filed for bankruptcy, its stock is still publicly traded and retains value, and that there are no allegations of the type of massive accounting fraud that could constitute a dire situation.

The plaintiffs argue they need not allege "dire circumstances" and cite to two cases where courts denied motions to dismiss: *In re Honeywell Int'l Erisa Litig.*, 2004 U.S. Dist. LEXIS 21585 (D.N.J. Sept. 14, 2004), and *In re Merck & Co.*, 2006 U.S. Dist. LEXIS 53729 (D.N.J. July 11, 2006).  In *Honeywell*, the court noted the "factor weighing against the presumption [was] the presence of fraud involving the leadership of the company," and that the plaintiffs pleaded "the fiduciaries were privy to a fraud that vastly inflated the price of its stock." 2004 U.S. Dist. LEXIS 21585, at *39.  In *Merck*, the plaintiffs alleged the company knew that its public statements about Vioxx safety, "the biggest drug, measured by sales, ever withdrawn from the market," were false.  2006 U.S. Dist. LEXIS 53729, at *10.  The court found "allegations in the Plaintiffs' Complaint of the adverse financial impact of Merck's withdrawal of Vioxx from the market and the potential liability for Merck for injuries attributed to Vioxx meet the threshold of 'present[ing] a situation where a company's financial situation is seriously deteriorating and there is a genuine risk of insider self-dealing' sufficient to call into question the fiduciary propriety of continued investment in the Company's securities by Plan fiduciaries." *Id.* at *24-25.  These allegations are significantly different than those set forth here, where even the plaintiffs describe their claims as only "mismanagement of the Company during the Class Period that caused the decimation of the value of its stock, and subsequent decision to be sold . . . and not to continue as an independent entity."  Opp. to MTD at 28.

Contrary to these decisions, a number of courts have applied the *Moench* presumption and dismissed ERISA-fiduciary-duty claims arising out of the failure to divest an employee retirement plan of company stock where the stock, as is the case here, faced significant losses resulting from investment in mortgage-backed securities.  For example, in the UBS AG ERISA

litigation, the company suffered a 69% drop in its share prices and received a $60 billion bailout from the Swiss government.  *In re UBS AG ERISA Litig.*, No. 08-6696, 2011 U.S. Dist. LEXIS 40428, *5-6 (S.D.N.Y. Mar. 24, 2011).  The court applied the *Moench* presumption and found that conclusory allegations "that Defendants had a general awareness of the riskiness of the [company] investment strategies that ultimately put the Company in a position where it accepted financial assistance [of $60 billion] . . . fall[s] well short of 'persuasive and analytically rigorous facts' demonstrating abuse of discretion."  *Id.* at *29.

> The court further noted:
>
> Given that, throughout the class period, UBS never reached the brink of imminent collapse, there remained a possibility that the value of UBS stock would rebound. In light of this possibility, and given that each plan presupposed that the fiduciaries would make the UBS Stock Fund available to plan participants, Defendants cannot be said to have abused their discretion.  To the contrary, had Defendants withdrawn the fund, and had the fund then rebounded, Defendants would likely have faced breach of fiduciary duty allegations for failing to carry out the settlors' intentions.  As other courts have stressed, the duty of prudence does not require plan fiduciaries to engage in such prognosticating.

*Id.* at *30.  *See also Bear Stearns*, 763 F. Supp. 2d 423, 575 (S.D.N.Y. 2011) ("While the ERISA Complaint alleges that Bear Stearns was mismanaged, experienced a substantial decline in its stock price, and was at risk of collapse, it does not carry the heavy burden required to establish that the [defendants] abused their discretion under *Moench* when they did not divest the Plan of Bear Stearns stock."); *In re Lehman Bros. Sec. & ERISA Litig.*, 683 F. Supp. 2d 294, 301-02 (S.D.N.Y. 2010) (finding that bankruptcy filing indicated that "a corporate collapse was imminent at some prior point in time," but that plaintiffs failed to allege defendant "knew or had inside information suggesting that any company financial reports were false or misleading," and that the "$2.8 billion loss and the stock decline" did not establish knowledge of the imminent

17

collapse); *Dudenhoeffer v. Fifth Third Bancorp*, 757 F. Supp. 2d 753, 762 (S.D. Ohio 2010) (accepting that defendant "embarked on an improvident and even perhaps disastrous foray into subprime lending, which in turn caused a substantial decline in the price of its common stock," but finding  no "dire financial predicament sufficient to establish a breach of fiduciary duty under . . . *Moench*"); *In re Citigroup ERISA Litig.*, No. 07-9790, 2009 U.S. Dist. LEXIS 78055, *57 (S.D.N.Y. Aug. 31, 2009) (granting dismissal and finding that allegations "supporting the position that Citigroup adopted imprudent and risky business strategies that resulted in substantial losses to the company" did not meet the dire situation necessary to overcome the presumption of prudence).

Lastly, the plaintiffs argue they have overcome the presumption of prudence, should it apply, because they allege that the defendants, without specifying who among them, artificially inflated the price of stock through their "highly risky and improper activities," without defining these activities.  This argument fails because plaintiffs allegations regarding the artificial inflation of the stock value are non-specific and conclusory and thus fail to meet the pleading standard set forth in *Twombly*.

Furthermore, even if the stock value was artificially inflated, the analysis regarding the presumption of prudence remains the same.  *See, e.g., Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008) (applying the *Moench* presumption and dismissing the breach of prudence claim because there is "no principled difference between how a fiduciary should respond to 'artificial inflation' of the stock price as opposed to other sorts of negative insider information"); *Dudenhoeffer*, 757 F. Supp. 2d at 762 (finding "it makes little or no difference to the analysis that Plaintiffs allege that the price of [defendant's] stock was artificially inflated

18

during the class period due to its lending practices" and dismissing breach of fiduciary duty of prudence claim).

In short, the complaint, although lengthy, alleges facts about the results of the fund investments but not facts about the defendants' methods of investment and is thus insufficient to overcome the presumption of prudence afforded to the fiduciaries.  Count I must be dismissed.

### C.  Count II: False/Misleading Statements

"ERISA requires plan fiduciaries to inform plan participants of facts material to their investments and forbids fiduciaries from making material misrepresentations about the risks of a fund investment."  *Johnson*, 2009 U.S. Dist. LEXIS 61334, *51 (citing *Edgar*, 503 F.3d at 350).  A plan administrator thus "acts as a fiduciary when explaining plan benefits and business decisions about plan benefits to its employees."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 492 (3d Cir. 2000).  The duty is both "a negative duty not to misinform, [and] also an affirmative duty to inform when the trustee knows that silence might be harmful. . ..  In the investment context, a misrepresentation is material if there was a substantial likelihood that it would have misled a reasonable participant in making an adequately informed decision about whether to place or maintain monies in a particular fund."  *Edgar*, 503 F.3d at 350 (internal quotations and citations omitted).  "Fiduciaries may be held liable for statements pertaining to future benefits if the fiduciary *knows* those statements are false or lack a reasonable basis in fact."  *Flanigan v. GE*, 242 F.3d 78, 84 (2d Cir. 2001)(emphasis added).

Plaintiffs allege the defendants breached their fiduciary duty to communicate with the plan participants by failing to provide complete and accurate information because their SEC

filings were false and misleading.[11]  Opp. to MTD at 29.  The defendants raise four independent

arguments as to why the plaintiffs' misrepresentation claim fails.  I analyze each in turn.

### 1.  SEC Filings As Fiduciary Speech

Defendants argue that SEC filings are not fiduciary speech.  In general, the defendants

are correct.  However, the SPD, which is fiduciary speech, incorporated various SEC filings and

noted that "Sovereign and the Plan can disclose important information to you by referring you to

[SEC filings]."  SPD at 2-3.  The SEC filings are therefore fiduciary communications.  *See, e.g.,*

*Pietrangelo v. NUI Corp.*, 2005 U.S. Dist. LEXIS 40832, *21-22 (D.N.J. July 18, 2005) (finding

fiduciary duty where plaintiffs alleged "direct and indirect communications with Plan

participants including, but not limited to, 'SEC filings, annual reports, press releases, and

Plan-related documents *which incorporated and/or reiterated these statements*'"); *Honeywell,*

2004 U.S. Dist. LEXIS 21585, at *30-34 (noting SEC filings are not "necessarily ERISA

fiduciary communications" such as where the SEC filings are not "specifically addressed to Plan

participants nor incorporated, by reference into such communications").

Thus, I shall consider the SEC filings as fiduciary speech because they were incorporated

in Sovereign's communications to its plan participants.

### 2.  Pleading Detrimental Reliance

Defendants argue that reliance is a required element of all ERISA disclosure claims.

They assert that plaintiffs have failed to plead reliance by the Plan or by the individual plaintiffs.

---

[11] Plaintiffs clarified in their opposition brief that they do not claim "they were entitled to
any extra communications from Sovereign and other Plan fiduciaries *other than any other public
investor*.  Rather, Plaintiffs claim that Sovereign's public filings, incorporated by reference into
the Sovereign SPD, contained material misrepresentations and omissions."  Opp. to MTD at 37
(emphasis added).

Plaintiffs point out that "[n]umerous courts have found that individual issues of reliance are not an issue in an ERISA § 502(a)(2) class action claim." *In re Aquila ERISA Litig.*, 237 F.R.D. 202, 209 (W.D. Mo. July 18, 2006) (citing cases and holding "the relevant detrimental reliance is that of the Plan, not the individual Plan participants").

The plaintiffs further argue that reliance should be presumed, pointing to cases finding dismissal inappropriate "where a breach of duty includes misrepresentations and omissions material to a decision by plan participants, which results in harm to the participants." *In re Uniphase Corp. ERISA Litig.*, 2005 U.S. Dist. LEXIS 17503, *43-44 (N.D. Cal. July 13, 2005). *See also, In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 833 (S.D. Ohio 2004) (holding an allegation sufficient under Rule 9(b) that "the Plan, and the Participants acting on behalf of the Plan, relied upon, and are presumed to have relied upon, Defendants' representations and nondisclosures to their detriment"); *In re Coca-Cola Enters., ERISA Litig.*, No. 06-0953, 2007 U.S. Dist. LEXIS 44991, *46 (N.D. Ga. June 19, 2007) (finding "reliance may be presumed in this instance because these Plaintiffs seek reimbursement to the Plan arising out of a plan-wide, uniform communication rather than an individualized claim").

No courts in the Third Circuit have addressed the requirements of reliance in an ERISA action under § 502(a)(2).  Because I find plaintiffs' claim deficient in other respects, I need not determine whether reliance can be presumed and if reliance was properly pleaded.

### 3.  Pleading Facts to Support False or Misleading Statements and Disclosure of Risk

Defendants argue that the plaintiffs failed to identify any statements that were false or misleading when made and therefore fail to sufficiently plead their claim.  They also argue that

the risks of investing in Sovereign stock were disclosed thus defeating plaintiffs' claims.

### a. Pleading Specific Facts

Dismissal is warranted where a plaintiff fails to specify *how* a particular disclosure was misleading or to allege the information that defendants knew but did not disclose.  *See, e.g., In re YRC Worldwide, Inc. ERISA Litig.*, No. 09-2593, 2010 U.S. Dist. LEXIS 116157, *25-26 (D. Kan. Oct. 29, 2010); *In re ING Groep, N.V. ERISA Litig.*, 749 F. Supp. 2d 1338, 1350 (N.D. Ga. 2010) (finding that plaintiffs did not support a claim for material misrepresentations where they "do not identify any particular communications to plan participants that were allegedly false or misleading, and do not specify who made the communications or how the communications were false when made").

In their response to the motion to dismiss, the plaintiffs allege that *all* defendants breached their duty to inform participants without specifying what information each defendant provided that was inaccurate or what each defendant should have provided to constitute "complete and accurate" disclosures.  They site paragraphs 102 to152 of their complaint as "detail[ing] the materially misleading and/or incomplete statements made during conference calls and in press releases and SEC filings."  Opp. to MTD at 30.  These paragraphs, however, recount Sovereign's disclosures and do not point to a single specific statement that was allegedly false when made, or to the information that plaintiffs allege the defendants knew and improperly failed to provide.  Instead, plaintiffs make sweeping allegations and rely on inference to establish wrongdoing.  For example, they allege "[t]he stunning amount of the loss incurred by Sovereign in the fiscal fourth quarter 2007 and the full fiscal year 2007, *indicates* . . . the quality of [Sovereign's] internal controls were actually severely deficient in monitoring

the deteriorating market conditions, loan defaults, and Sovereign's imprudent investments."  *Id.*

at ¶ 149 (emphasis added)

      A review of the complaint as a whole provides little additional support for the plaintiffs'

assertions.  The plaintiffs contend that Sovereign's communications with plan participants

"fostered an *inaccurately rosy picture* of the soundness of Sovereign stock as a Plan investment

. . . by not disclosing *negative material information* concerning investment in Sovereign stock."

Am. Compl. ¶ 175 (emphasis added).  At their most specific, plaintiffs assert:

> Defendants failed to provide participants with information regarding *inter alia,*
> the risks posed to the Company by the acquisition of Independence [Community
> Bank Corp.], such as deteriorating balance sheets and impeded opportunity for
> stock buy-backs; Sovereign's ever-increasing exposure to losses from the rapidly
> deteriorating credit quality of its loan portfolio; the declining value of its Metro
> New York segment; and the Company's exposure to losses from its off-balance
> sheet assets.

*Id.* at ¶ 169.

      Plaintiffs do not allege facts to support that Sovereign knew of the problems they allege

existed.  For example, the plaintiffs make numerous allegations that Sovereign's credit quality

had deteriorated and that Sovereign did not disclose the "true risks of investing in its stock to

the Plan participants."  *See, e.g., id.* at ¶¶ 94, 101.  They allege that "Sovereign was extending

credit using lax or virtually no underwriting standards."  *Id.* at ¶ 81.  However, the plaintiffs fail

to explain these allegations in light of their pleadings that note Sovereign disclosed its

allowances for and its reported credit losses as well as the credit quality of its portfolio.  *See*

*e.g., id.* at ¶¶ 102, 112, 121, 126, 131, 133, 138, 146, 152.  In addition, Sovereign reported that:

it "had a blended FICO of 680 which implied that there was a mix of both prime *and sub-prime*

assets in this sale," *id.* at ¶ 114 (emphasis added); "FICO scores are consistent with what they

have been for the past couple of years," *id.* at ¶ 116; "[t]he blended FICO in our autobusiness [is] in the 720 range," *id.*; and, "we haven't compromised FICO scores," *id.* at ¶ 128.

Sovereign's SEC Form 10Q report dated August 9, 2007, stated that it acquired Independence Community Bank Corp. on June 1, 2006, "to connect [Sovereign's] Mid-Atlantic geographic footprint to New England and create new markets in certain areas of New York" with the belief that it would "strengthen [its] franchise." *See Def. Exh. B,* at 31. Sovereign explained that it "engaged an outside consultant to conduct an analysis of Independence's multi-family loan portfolio" and as a result increased its provision for credit losses. *Id.* at 41. Sovereign also noted that the acquisition increased its general and administrative costs. *Id.* Plaintiffs do not allege facts to support a claim that Sovereign knew of the problems they allege existed, that those problems actually existed, or how Sovereign's disclosures acknowledging the impact of the acquisition of Independence on its financial condition were insufficient.

Furthermore, Sovereign disclosed the "mild weakening of the credit quality" of its auto-loan portfolio, *id.* at 46, and explained the credit defaults in the auto industry, noting that "credit losses were significantly higher than our expectations and were the primary reasons for additional provisions of credit losses." *Am. Compl.* ¶ 152. In response, Sovereign stated it "strengthened its underwriting standards in the third and fourth quarters of 2007 on its entire auto loan portfolio." *Id.* Sovereign disclosed the credit quality of these loans, noting:

> [A]bout 62% of [the portfolio] would be over 700 and that varies according to the sector that we're in. In the Northeast it's somewhere around 64%. But in some of the expansion markets, it's a little lower as we were working, some of the second tier and third tier credits there. The defaults are coming from a fairly broad range of the FICO scores . . . not concentrated in any one sector in the FICO range.

*Id.* at ¶ 135 (quoting Sovereign's 3Q 2007 Investor Conference Call). Again, Plaintiffs do not

allege facts to support that Sovereign knew these statements to be false when they were made.

Similarly, although Plaintiffs allege that the defendants disclosed the good will impairment charge for its Metro New York segment in a 2007 SEC filing, they do not allege the facts to support the assertion that the defendants knew of the declining value sooner than they reported it. *Id.* at ¶ 93. Lastly, Plaintiffs assert that Sovereign disclosed that it had off-balance sheet assets. They allege without any factual support that the use of these investments "and other complex poorly-described investment vehicles prevented full and fair disclosure to the participants of the risks known to and assumed by Sovereign." *Id.* at ¶ 154.

In short, Plaintiffs failed to allege facts to support how any particular disclosure was misleading or what information the defendants knew but did not disclose.

### b. Warning of Risk of Investment

The Plan explicitly warned participants of the general risks associated with investing in the Sovereign stock fund. Sovereign's SPD cautioned:

> [T]he Sovereign Stock Fund is different from the Plan's other investment funds. It invests only in one security – Sovereign common stock – instead of a diversified portfolio of investment like the other funds. If you hold investments in the Sovereign Stock Fund, you should be aware that there is a risk to holding substantial portions of your assets in the securities of any one company, as individual securities tend to have wider prices swings, up and down, in shorter periods of time than investments in diversified investment funds.

SPD at 16. The Plan further clarified: "Each Participant and Beneficiary shall assume *all risk* connected with the fluctuation in value of the balances in his Account." Plan at 84 (emphasis added).

In *Edgar*, the Third Circuit found the defendants had "fulfilled their duty of disclosure under ERISA by informing Plan participants about the potential risks associated with

investment in the [company] Fund." 503 F.3d at 350.  The SPDs in *Edgar* were found to

> inform Plan participants that their investments are tied to the market performance
> of the funds; that each fund carries different risks and potential returns; that
> participants are responsible for investigating the investment options; and that, in
> doing so, they might consider seeking the advice of a personal financial advisor.
> In addition, the Plan Descriptions explicitly warn participants that there are
> particular risks associated with investing in a non-diversified fund.  Nowhere in
> the Plan Descriptions or the Plans themselves are participants guaranteed a
> particular return on their investments.

*Id*.

Courts in this District have followed *Edgar* and dismissed claims similar to this one.

For example, in *Johnson*, the court found that "the allegedly misleading statements themselves

advised investors of the market risks presented by the company's involvement in the subprime

market. . . .  The Plan documents also explicitly advised participants that the Radian stock fund

was non-diversified and that maintaining a diversified and balanced portfolio was key to

retirement security.  These disclosures, taken together, fulfill the duty of disclosure under

*Edgar*."  *Johnson*, 2009 U.S. Dist. LEXIS 61334 at *53.  *See also Dann*, 708 F. Supp. 2d at 493

(following *Edgar* and dismissing failure to disclose claim where the SPD warned of non-

diversified investment risks).

As previously noted, Sovereign's SPD explicitly warned participants that the ownership

of a single stock carried with it greater risks of highs and lows.  However, that warning is not

material here where plaintiffs say the Plan participants and beneficiaries were subjected to risks

due to false and misleading statements made by the fiduciaries.  The risk of such breaches is not

contemplated by Sovereign's warnings.

Nonetheless, plaintiffs' failure-to-disclose claim must be dismissed because there is no

allegation of who looked the other way while the horses were being stolen.

### 4. Efficient Market Hypothesis

The plaintiffs' claim that the defendants breached their fiduciary duty to disclose also fails because the plaintiffs cannot show damages.  The plaintiffs allege that Sovereign's delay in disclosing its "risky underwriting standards" artificially inflated the value of its stock.  Am. Compl. at ¶ 155.  However, in *Edgar*, the Third Circuit upheld the District Court's finding that the public release of adverse information "would have resulted in a swift market adjustment" and "the Plans would have sustained the same losses they incurred when the Company publicly announced the quarterly results."  503 F.3d at 350.

*Edgar* cited to the Fifth Circuit opinion, *Crocker v. Federal Deposit Ins. Corp.*, 826 F.2d 347, 351-352 (5th Cir.1987), which explained the efficient market hypothesis.  In *Crocker*, the court noted that the inflated stock price was maintained because the defendants had "concealed material financial information from the shareholders and the public that would have demonstrated the failing condition of the Bank."  *Id.*  The court found that "had this information been released, the stock price would have immediately and precipitously fallen especially if . . . an entire class of shareholders had simultaneously dumped their stock on the market.  Thus, there would have been no market for the stock at the artificially high price.  Without such a market, the [plaintiffs'] envisioned 'profit opportunity' evaporates into hardly more than an illusion."  *Id.*

At least one court in this District has applied the efficient-market hypothesis and dismissed a claim for breach of the fiduciary duty to provide complete and accurate information.  *See, e.g., Urban v. Comcast Corp.*, No. 08-773, 2008 U.S. Dist. LEXIS 87445 (E.D. Pa. Oct. 28,

27

2008) (quoting *Edgar* and finding that failure to inform plan participants of adverse conditions

prior to the earnings announcement was not a breach of ERISA disclosure obligations); *cf. In re*

*Schering-Plough ERISA Lit.*, No. 08-1432, 2010 U.S. Dist. LEXIS 64381, *21-22 (E.D. Pa.

June 29, 2010) (denying motion to dismiss and electing not to apply the efficient market

hypothesis because the delay in releasing accurate information on the company's condition

resulted in "additional repercussions beyond a predicable reduction in stock value [including]

. . . several government investigations").

Although the defendants raised this market adjustment argument, plaintiffs did not

respond.  I find that just as in *Urban* there is nothing in the complaint to distinguish the

pleadings here from those in *Edgar*.  As a result, the plaintiffs cannot establish damages.

The plaintiffs have failed to plead specific facts in support of their allegations that the

defendants did not disclose material information and the plaintiffs cannot establish damages as a

result of the alleged failure to disclose.  Count II must therefore be dismissed.

### D.  Count IV: Prohibited Transaction

The Plaintiffs allege in Count IV of their complaint that the defendants breached their

fiduciary duties by engaging in a prohibited transaction.  They assert that Sovereign, as the Plan

Sponsor, loaned $40 million[12] to the ESOP through five separate transactions with an interest

rate of ten percent on each loan,[13] to purchase 6.4 million shares of Sovereign stock.  They

---

[12] The plaintiffs argue in their briefs that $40,000,000 was borrowed and the loan
agreements total $40,000,000.  The complaint, however, erroneously alleges that the ESOP
borrowed "$440,000,000 from Sovereign," citing to a Sovereign SEC filing that states the ESOP
borrowed $40,000,000, not $440,000,000.  Am. Compl. ¶ 42.

[13] Copies of the five separate unsigned loan agreements, which were consolidated into a
single note for $40,000,000, were attached to the Defendants' motion for summary judgment

further allege that the outstanding debt in December of 2006 totaled nearly $26 million, the loan was collateralized by unallocated assets of the ESOP, and the average interest rate on the loan was ten percent in 2006 and 2007.  Am. Compl. ¶ 42.  The plaintiffs claim that "[c]ausing the Plan to pay above reasonable market rate interest on the collateralized loan taken out for the ESOP portion of the Plan . . . constituted a prohibited transaction . . . and caused losses to the Plan and its participants and beneficiaries." *Id.* at ¶ 229.

ERISA permits the lending of money between the plan and a party in interest where: "(A) such loan is primarily for the benefit of participants and beneficiaries of the loan, and (B) such loan is at an interest rate which is not in excess of a reasonable rate."[14]  *See* ERISA § 406(a)(1)(B); § 408(b)(3)(B).

The defendants argue for dismissal because they assert that: (1) the Plan did not pay any of the interest owed, and (2) the plaintiffs have not alleged any facts to support the conclusion

---

along with an affidavit swearing that the five individual notes were lost or mislaid.  The loan agreements may be considered at the motion to dismiss stage because the Plaintiffs have not disputed their authenticity and they are integral to the Plaintiffs' claims.  *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[14] The plaintiffs state in a footnote that "there is also an issue of fact with respect to whether the Loan 'is primarily for the benefit of the participants and beneficiaries of the plan.'"  Plfs' Opp. at 49, n.12.  Plaintiffs fail, however, to allege in their amended complaint that the loan was not primarily for the benefit of the plan participants and beneficiaries.  An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote).  *See, e.g, IBEW Local Union No. 380 Health & Welfare Fund v. Travis Elec., Inc.*, 2008 U.S. Dist. LEXIS 58037 (E.D. Pa. July 30, 2008) (rejecting argument for arbitration where party "attempt[ed] to preserve the argument in a footnote, noting "[t]his form of argument is not attractive, nor is it persuasive"); *Tidewater Oil Co. v. United States*, 409 U.S. 151, 174 (U.S. 1972) (noting that "Mr. Chief Justice Hughes was wont to say, 'Footnotes do not really count.'").  *But see* Edward R. Becker, *In Praise of Footnotes*, 74 Wash. U.L.Q. 1 (1996).

that the ten percent interest rate charged was unreasonable.

### 1. Payment of Interest

The loan terms state: "The Trustee will pay all principal and interest payments due under the Note on a timely basis out of and from contributions made by the Sponsor [Sovereign] to the ESOP Trust to enable the Trustee to satisfy the Obligations." The defendants argue that "Sovereign gave money to the Plan to cover that interest payment" and that the "'borrowing' was simply an accounting construct." Plaintiffs, however, allege that the defendants paid "above market interest rates *to the Company* on the collateralized loan." Am. Compl. ¶ 170. Because this is a motion to dismiss, I must accept the plaintiffs' allegation as true and cannot dismiss the claim simply based on the loan terms.

### 2. Reasonable Rate of Interest

The applicable regulations state: "All relevant factors will be considered in determining a reasonable rate of interest, including the amount and duration of the loan, the security and guarantee (if any) involved, the credit standing of the ESOP and the guarantor (if any), and the interest rate prevailing for comparable loans." 29 CFR § 2550.408b-3(g). Plaintiffs allege the loan amount and interest rate, and that the loan was secured by unallocated Sovereign stock. They do not, however, allege any facts relating to credit standing or the prevailing rate for comparable loans.

Nonetheless, the reasonableness of the interest rate is generally a question of fact that requires the presentation of evidence. *See, e.g., Bevel v. Higginbottom*, 2001 U.S. Dist. LEXIS 17977, *38 (E.D. Okla. Oct. 4, 2001) (dismissing claim that interest rate was unreasonable only after a trial and a finding that "Plaintiffs *offered no evidence* that a more favorable rate of

interest was available"); *cf., FDIC v. Ambika Investment Corp.*, 1994 U.S. App. LEXIS 40952,

*7-8 (5th Cir. Dec. 1, 1994) (noting "[r]easonableness is generally a fact question" and reversing

grant of summary judgment where there was no evidence presented on reasonableness of

substituted rate of interest for bank in an action to recover unpaid balance of promissory notes);

*United States v. 429.59 Acres of Land*, 612 F.2d 459, 464 (9th Cir. 1980) (upholding

commission's finding after hearing "extensive evidence" and holding "determination of a

reasonable rate of interest is a question of fact" in a condemnation proceeding).

### 3. Proper Defendants

Plaintiffs name "Sovereign, the Director Defendants, the Compensation Committee and

the Retirement Committee" as defendants in Count IV.  ERISA defines a fiduciary as one who

"exercises any discretionary authority or discretionary control respecting management of [a]

plan or exercises any authority or control respecting management or disposition of its assets."

29 U.S.C. § 1002 (21)(A)(i).  The Supreme Court has clarified that "one is a fiduciary to the

extent he exercises *any* discretionary authority or control."  *Firestone Tire & Rubber Co. v.

Bruch*, 489 U.S. 101, 113 (U.S. 1989).  The defendants assert that pursuant to *Firestone*, the

only proper defendant for this claim is the Retirement Committee.

The Plan states that "the Company shall have the sole responsibility for making the

contributions . . . [and] for the administration of this Plan," but allows the Company to "appoint

an Administrative Committee to discharge its duties as Plan administrator."  Plan, Art. X, §

10.1.  As the plaintiffs acknowledge in their complaint, Sovereign utilized this provision and

appointed the Retirement Committee as its Administrative Committee.  Indeed, the plaintiffs

allege that the Retirement Committee was "explicitly entrusted with the administration of the

Plan."  Am. Compl. ¶ 56.  The Retirement Committee is therefore a proper defendant in Count IV.

However, although Sovereign delegated administration of the Plan to the Retirement Savings Plan Committee, it retained the power to modify, amend, interpret or terminate the plan. The Third Circuit holds that "ERISA broadly defines a fiduciary" and has found a company to be a fiduciary where it "maintained any authority or control over the management of the plan's assets, management of the plan in general, or maintained any responsibility over the administration of the plan."  *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233 (3d Cir.1994).  In *Curcio*, the company was found to be a fiduciary because, in part, it could modify or amend the plan at any time at its sole discretion and could terminate the plan at any time. Sovereign was also a Plan fiduciary and therefore is a proper defendant in Count IV.

The allegations against the individual Board of Director defendants are conclusory, and without factual support.  Plaintiffs state only that each "exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets."  *See, e.g., id.* at ¶¶ 17-30.  Plaintiffs further allege that "they knew of adverse non-public information about the business of Sovereign" via corporate communications and that they "participated in issuing false or misleading statements."  *Id.* at ¶¶ 32-33.  These allegations do not support a claim that the Director Defendants breached the duty to protect the Plan from an unreasonable rate of interest.  The Director Defendants must therefore be dismissed.

Plaintiffs' only allegations regarding the Compensation Committee's fiduciary responsibilities are also conclusory and without factual support.  Plaintiffs assert simply that the Compensation Committee "exercised discretionary authority with respect to the management

and administration of the Plan and/or management and disposition of the Plan's assets." *Id.* at ¶ 35. The only additional facts they offer are that the Compensation Committee administered the equity compensation plan and made recommendations to the Board regarding the equity-based and incentive compensation plans. This is insufficient to establish a fiduciary relationship and the Compensation Committee shall be dismissed as a defendant.

The plaintiffs may proceed on Count IV but only against defendants Sovereign and the Retirement Committee.[15]

### E.    Breach of Fiduciary Duty to Act Solely in the Interest of Participants and Beneficiaries (Count V)

Defendants argue that Count V, setting forth a breach of the duty to act solely in the interest of participants and beneficiaries, must be dismissed. They assert the plaintiffs failed to plead any action taken by a fiduciary in his or her Plan-related capacity that he or she did not believe was in the best interests of participants and beneficiaries.

Plaintiffs argue that: (1) the price of the Sovereign stock was tied to the compensation and tenure of the "Defendants" (they do not distinguish among the defendant groups or the individuals); and (2) that these defendants were "indebted to Sovereign through numerous loans

---

[15] Plaintiffs included Knabb under the heading "Sovereign Defendants" but specifically name "Sovereign" and not "Knabb" or "all defendants" in Count IV. However, even if plaintiffs meant to include Knabb under "Sovereign," she is not a proper defendant. Plaintiffs allege that defendant Knabb "served . . . as the Plan Administrator" and "was charged with general Plan administration, which, inter alia, included communications with the Plan's participants and beneficiaries regarding the Plan, and providing participants and beneficiaries with information and materials required by ERISA." Am. Compl. ¶¶ 16, 55. The "Plan Administrator" is clearly defined by the Plan to be the Retirement Committee and plaintiffs concede this designation in their complaint. *Id.* at p.17, n. 2. Regardless, because the only specific factual allegations against Knabb concern communications with Plan participants and beneficiaries, she cannot be charged with fiduciary responsibility for the payment of an unreasonable rate of interest.

issued to them by the Company amounting to millions of dollars."  Opp. to MTD at 50; Am.
Compl. ¶ 233.  They argue the fiduciaries were required to "make special efforts" to ensure they
were not tainted by these conflicts, such as divesting the Plan of Sovereign stock, engaging
independent advisors to make judgments regarding Sovereign stock, and notifying federal
agencies "of facts and transactions which made Sovereign stock an unsuitable investment for the
Plan."  Opp. to MTD at 50; Am. Compl. ¶ 234.

However, "the mere fact that a fiduciary has an adverse interest, or that a fiduciary's
action incidentally benefits an employer, does not show that a fiduciary has breached the duty of
loyalty." *Johnson*, 2009 U.S. Dist. LEXIS 61334 at *63.  Furthermore, as explained above, the
plaintiffs have not alleged facts to overcome the presumption of prudence afforded the
fiduciaries in continuing to offer Sovereign stock pursuant to the ESOP.  Plaintiffs similarly
failed to allege facts that should have been relayed to federal agencies.  *See e.g., In re Citigroup
ERISA Litig.*, 662 F.3d 128, 145-146 (2d Cir. 2011) (granting motion to dismiss where
"Plaintiffs do not allege any specific facts suggesting that defendants' investments in Citigroup
stock prompted them to act against the interests of Plan participants").

### F.  Derivative Fiduciary Duty Claims (Counts III and Count VI)

Defendants argue that pursuant to *Edgar*, if the plaintiffs fail to overcome the *Moench*
presumption and thus cannot state a claim under the abuse of discretion standard, the derivative
claims of breach of the duty to monitor (Count III) and co-fiduciary liability (Count VI) must
also be dismissed.

These claims are dependent upon a breach of fiduciary duty.  Because I find that the
complaint fails to adequately plead such a breach, the derivative claims will be dismissed as

well.

## IV. CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss plaintiffs' claims that the defendants breached their fiduciary duties to prudently manage the Plan, to disclose complete and accurate information, to monitor fiduciaries, to be loyal, and committed breaches as co-fiduciaries, shall be granted and these claims are dismissed.  Defendants' motion to dismiss Plaintiffs' claim that Sovereign and the Retirement Savings Plan Committee breached their duty of loyalty by charging an unreasonable rate of interest in connection with the Plan's purchase of Sovereign stock, however, shall be denied.

An appropriate order follows.